The next case scheduled for argument this morning is United States v. Shulaya and United States v. Kertzidze. We have first Ms. Bennett for Mr. Kertzidze, if I'm pronouncing that correctly. Hi, good morning, Your Honors. It's Kertzidze. Kertzidze. Thank you. Good morning, Your Honors. May it please the Court. I'm Megan Bennett, and along with Co-Counsel Ken Womble, who is joining in, we represent Defendant Appellant Avtandil Kertzidze. Mr. Kertzidze was convicted of two counts after trial, a wire fraud conspiracy and a racketeering conspiracy. We briefed several issues, but I'd like to focus on two of them during our brief time this morning, specifically the conscious avoidance instruction and the sentencing. If I may start with the sentencing, it is our argument here that the sentence must be vacated and remanded for resentencing. The remarks by the District Court in the context of general deterrence impermissibly created the appearance that Mr. Kertzidze's national origin and ethnicity played a role in fashioning the sentence with respect to the general deterrence. As this Court has repeatedly and clearly stated that while general deterrence is undoubtedly a proper consideration in imposing a sentence, a defendant's ethnicity may not be taken into account when selecting a particular sentence to achieve that general deterrence. In CABA, which I know Judge Wesley sat on that panel, and in Loeing previously, this Court selected particular comments from those District Courts, noting that much like the Caesar's wife rule, just as Caesar's wife had to be above suspicion, justice must satisfy the appearance of justice. So even without actual bias, it is simply the appearance of bias that is the concern here. So in Loeing, for example, the District Court stated that his sentencing decision was to, quote, generally deter others, particularly others in the Asiatic community, because this case received a certain amount of publicity in that community. And I want the word to go out from this courtroom that if people want to come to the U.S., they had better abide by our laws. This Court said that though the general deterrence consideration was proper, it was those statements that created the appearance of reliance on the defendant's national origin or ethnicity, and it was that appearance that required remand for resentencing. Likewise in Cresca. Counsel, may I just ask, since your client's sentencing, the case has been reassigned to Judge Cresca, is that correct? That's correct. And Judge Reed, oh sorry. Oh, I'm sorry. So if we were to remand the case for resentencing, it would, as a matter of course, be going to a different judge, not the same one who imposed the original sentence, right? That's right. And this Court said in both CABA and Loeing that, again, just because of the appearance of bias, that in those cases, the best course, the only course was to remand to a different judge. In this case, Judge Cresca already has the familiarity with the general background and context of this case because she's been handling it since 2018. And I, let me just raise one additional thing, that I don't know how this would play out if it were remanded, but it would be a plenary resentencing in your view, right? It would have to be, yes, you mean on both counts? Yeah, it would just be, we would just vacate the sentence and it would just be a whole new resentencing, right? Correct. And just to flag, that would then raise the possibility of a judge at the time of resentencing would have to take into account all of the facts as of the current moment of the resentencing. And I just flagged that because I've seen this before. I don't know anything about what may or may not have transpired in your client's life or situation since then. But considering that at the original sentencing, the judge took into account the fact that he participated in violent enforcement on behalf of Mr. Shalaya while he was detained, I would presume that you have independently undertaken an evaluation of whether he would be facing a risk of a higher sentence or potentially a lower sentence if he were to get this resentence that he's asking for. I don't know if he's engaged in misconduct. I would certainly hope or presume he is not, but I simply raised the question to make sure that you've had that conversation without telling us what it is with your client to make sure that this is something he thinks is in his best interest. Without it getting any sort of extra record information, I can say we're confident that this would be in his best interest and that there are many factors that would weigh in his favor with the resentencing at this time. So I mean, I think just like the comments in CABA were remarkably similar to those in Loeing, so is the case here. The district court said specifically that leading with the fact that general deterrence was a factor that the guidelines didn't adequately capture. Maybe you could turn now to conscious avoidance in the time. You have two minutes. Thank you. Thank you, Judge Conley. So the question here with conscious avoidance is not the content of the instruction, but whether the facts in the record justified giving the instruction. And here, our defense on the wire fraud was not as in the litany of instructions. I know that Judge Nardini just published the decision last week in WED, where there was substantial evidence of the defendant's actual knowledge, but the defendant was in fact denying having had knowledge. So in WED, for example, it was the phone marketing scheme where the defendant had conducted an audit. The audit showed that there were illegal charges made on the phone accounts. The defendant didn't alert the authorities. The defendant got monetary remuneration from the illegal misconduct. The defendant intentionally had people other than himself engaging in the conversations. So much like in WED and Gaudio, the NCAA case, where there were recruiters who worked for, for example, Adidas, who knew, who couldn't but have known that accepting money would have made the athletes ineligible. In this case, here's what the government relied on in asking for the instruction, that Mr. Kurtzidze retrieved a poker house. That's not disputed. And that Mr. Kurtzidze knew he ran a poker house. That's not disputed. The question is whether Mr. Kurtzidze knew of the object of the scheme here, which was the code manipulation. Avtandil Kurtzidze has a sixth grade education. His job was literally to get hit in the head. He drove Melman, the programmer, once, Melman said twice, and then he corrected his testimony at trial. He drove Melman once to a casino. The two trips to the one, apparently only one of which actually happened. Mr. Kurtzidze was, Mr. Melman testified that Mr. Kurtzidze was silent during that drive. And it was that silence, in part, that the government relied on and the court relied on in giving the conscious avoidance instruction. Weren't there some additional facts, though, as well, that the government pointed to, for example, that Kurtzidze was in the room with the co-conspirator at an illegal gambling establishment run by Mr. Shibuya when they were using the test slot machine to fix problems with the rigging software, and that he was carrying the slot machine inside and he knew the gambling and this kind of rigging. There was a basis for saying that there was a high probability that something illegal regarding gambling was going on. So that, plus the lengthy drive in which he was meticulous about not speaking with the person who was helping rig the machines, wasn't that really an adequate basis for giving conscious avoidance? So it's not an adequate basis for the conscious avoidance instruction. In fact, the government needs to show that there was, or for the instruction, there needs to be proof beyond a reasonable doubt that a rational jury could find, could use, could base a decision that the defendant was aware of the high probability of this particular scheme. So the scheme that was charged was the manipulation of the code. It was not the use of the poker machine itself. In fact, the use of that poker machine, which Kurtzidze moved, there are photos of Mr. Kurtzidze moving it. We're not disputing that he knew that there was a poker machine. The question is whether he consciously avoided knowing the casino scheme. There were many people who, Kurtzidze was in Atlantic City for his own fights, there were all these other people who surrounded Shulaya, who was sort of the mastermind of the Caesars, Harrah's, whether he drove, the driving Mr. Pellman, Mr. Melman once, which is all that Melman could ultimately testify to, and not speaking, they don't even speak the same language. While they both had some Russian, Melman was from Moldova and Kurtzidze is from Georgia. They have nothing in common. Melman is a 20-year-old person. Did they have no common English? Mr. Kurtzidze, I can't speak to, Melman does speak English, Kurtzidze does not speak English. They probably had some shared Russian, but that's not Kurtzidze's first language, and I don't believe it's Melman's first language. Doesn't it still strike you as odd that there was absolutely no conversation, that there seemed to be no doubt that it was a silent drive from New York to Atlantic City? I mean, again, I can't bring in extra judicial or extra record evidence, but no, it doesn't strike me as strange that those two would not have had anything to say to each other. I have to say, having driven four to five hours every summer with my kids, much of those drives, they just have their headphones on. It all depends on how old they are. They'll talk to you more when they're older and they need money. Thank you very much. You've reserved a minute for rebuttal. We'll hear from Ms. Feldman. You're on mute. There you go. There I go. Good morning, Your Honors. Arza Feldman, CJA Counsel for Mr. Shalaya. Your Honors, the most important issue to my client, and one that he has addressed repeatedly with this court and with the district court, is his constitutional right to retain counsel of his own choosing. He has presented pro se submissions to that effect, and we urge this court to review and consider those submissions in earnest on his behalf. As counsel, we understand the district courts have discretion when a defendant requests the substitution of counsel in the middle of proceedings. In our brief, we raise the district court's abuse of its discretion in not permitting retained counsel, Mr. Nimitz, a one-month adjournment to address defendant sentencing, especially in light of the 65-year sentence that defendant was facing at the time. How many counsel did he retain over the course of these proceedings? I'm counting Kapitonoff, Shalaya Kachuti, I don't know how to say his name, Macedino, and then the fellow at the end who wanted the very last day and the day before sentencing. So that's five, plus he had CJA counsel appointed during that time, which he also objected to, right? I think Mr. Kachuti was his CJA counsel. Oh, CJA, that's right. Right, and Mr. Kachuti had a... I've got, I've got also Ms. Louise Jun, and Shulman, and Nyman, and then Preskozy. So my list is even longer. Okay, so Mr. Kachuti and Jennifer Louise Jun were CJA counsel. They were both CJA counsel. Mr. Shulman, I believe he had retained, there's a question, the court wasn't sure that he had retained him. Then there was this correspondence that he submitted showing that he did retain him, but he was not permitted to participate in the proceedings. But I think the bottom line here is that when a lawyer shows up, literally the day before sentencing, when this whole thing has been dragging on, is it really an abuse of discretion for the district court to say, no, I've scheduled this. If you wanted a new lawyer, he needed to show up sooner than the day before if you want an adjournment. I understand that, Your Honor. However, that has to be weighed against the fact that what Mr. Nimitz was asking for was a one month adjournment. Mr. Shulman was incarcerated. It looked like he was going to be incarcerated for a very long time. So it's always the length of the adjournment that governs the right to have your seventh or eighth attorney. So that as long as the attorney asked for just a two to three week adjournment, we can have 12 or 13 or 14 counsel sooner or later. I mean, doesn't that bespeak of a potential for abuse? I understand what your position is, Judge. However, I don't think that... Question. You couched it in terms of that it was an abuse of discretion in light of the length of the time of the adjournment he asked. And I asked you, is that what determines the abuse of discretion, the length of the adjournment? I'm not certain that it is. I would say certainly in part and in the context of each case that obviously has to be determined individually and separately, relevant to what the defendant is facing, what he's asking, who is appearing. And in fact, whether he's had 12 or 13 lawyers or whether he's had two or three. So, and I think that that makes a difference. How many did your client have at the time that this request occurred? Previously, six? Well, he had had CJA counsel imposed on him. The court asked, the court appointed CJA counsel and insisted that CJA counsel continue regardless of the fact that there was a retained counsel. And also he then attempted to... How many retained counsels that he had prior to this? I believe three. All right. He had two prior to Mr. Nimitz. I think he had two. He had one that actually participated, one that was not permitted to participate. And then Mr. Nimitz who appeared at sentencing and participated only briefly. And I understand that he made multiple attempts to change counsel, but given the fact that he was facing such a long sentence and the fact that the adjournment that was being requested was really not unreasonable, we suggest that the court should have granted that adjournment and that the failure of the court to do so was an abuse of its discretion. With the time remaining, I'd like to address the defendant's sentence. We ask that the court review the appellant's sentence of 45 years as substantially unreasonable. While the sentence falls within the guidelines, we ask the court to review the 45-year sentence as excessive, especially in the context of the sentences of the co-conspirators in this case, none of which exceeded the 15 years, which was the sentence that was being proposed by defendant's counsel. The longest term in the PSR, if I recall correctly, for any of the other co-defendants was less than five years. This defendant had no prior criminal... Excuse me, but Mr. Shalaya played a distinctive and leading role in the enterprise that was alleged and proven. Isn't that right? That is correct. That is correct. We're not denying that. And the PSR showed his involvement in violent assaults, not just in cigarette trafficking or contraband trafficking. Isn't that right? So wasn't the court going to take those facts into consideration in composing a sentence within a guideline sentence, no less? Yes? Yes, Your Honor. The court certainly had the right to do that. However, in light of the fact that these assaults did not result in any permanent injury or disfigurement, and that the extent of the conspiracy in part, not wholly, but certainly in part was driven by government action. And while there were other factors in part and parcel, the government's actions caused the 16-point enhancement from losses resulting from the conspiracy and greatly contributed to the loss calculation. In addition, as was pointed out by counsel at the sentencing, defendants would certainly be deported upon his release and the public would be protected from his further criminal activity. And a 15-year sentence is a hefty sentence. The defendant was 41 years old at the time of sentencing, and what essentially the court did was sentence him to life. I mean, a 45-year sentence for a 41-year-old man is basically a life sentence. I think he will have a long life, but thank you very much. We have a minute for rebuttal. Thank you very much, Your Honor. Thank you. Thank you, Your Honors, and good morning. My name is Andrew Adams. I was the AUSA, one of the two AUSAs who handled the investigation and the prosecution and trial and sentencing below, and I'm here for the government today. If the panel will permit, I'll begin with Mr. Kurtzidze's arguments and address them in the same way that Ms. Bennett did, starting with the conscious avoidance point. The evidence of Mr. Kurtzidze's actual- Before we get to conscious avoidance, does the government take the position that no resentencing is warranted, notwithstanding the sentencing judge's remarks? That's correct, Your Honor, and in fact, without the briefing, moving certain remarks around and actually looking at what Judge Forrest said with respect to arguments presented by Mr. Kurtzidze and the points that she had to make independently about deterrence, there is no reason under Leung or Cava to send this back for resentencing. Unlike in those cases, there is no, as this court said in Corretto, there's no indication that Judge Forrest explicitly stated an intention to deter others sharing some national origin from violating the United States law, and indeed, in addressing Mr. Kurtzidze's arguments about his own national origins and his fame, what Judge Forrest did was, in fact, make the point that he should not be treated differently as the result of his Georgian nationality. If you go to the sentencing transcript and walk through what Judge Forrest actually said, at no point does she say that she wants to send a message to the Georgian community. That's just a relic of the appellate briefing by Mr. Kurtzidze. Well, I mean, I'm looking at 1887 in the appendix, and she says he, meaning Mr. Kurtzidze, is somebody who can walk into various places within the Georgian community here in the United States, and is able to convey and be a vehicle for a message of general deterrence that is separate and different. I don't know how you slice the salami that thin and find it's different from Cabo Leon. In two ways, Your Honor, our position is that in that particular paragraph that follows immediately on her comments about his fame generally, including the fact that he was a world-famous boxer, it's true that his particular power and his particular role within the Shalia enterprise gained power and gained intimidation and fearsomeness from his particular fame within the Georgian community, and Judge Forrest, I think rightly, was commenting about that argument in response to Kurtzidze's arguments about why he should. Yeah, but how do you deal with the fact that she talks about him walking into the Georgian community? I mean, I get it. I don't think like in the cases like Cabo Leon where we said, look, we don't think that the judge harbored any actual bias of any sort, and in many circumstances was probably responding to arguments made by the party, but once they start talking about how messages of deterrence will be received in certain ethnic communities, we sent it back. I guess I'm not sure why you're fighting this one. Your Honor, I think taken, and I won't fight beyond this, but I will say taken in the whole with her comments redirected towards the notion that no one, regardless of where you are from, can escape the full significance of the U.S. criminal law with her comments on individuals being deterred generally. If he'd been African American, do you think that her statement that you insert African American for Georgia community, you think that would run afoul of Cabo? I think it would, don't you? I believe that if she had said that he... Various places within the Black community here in the United States is recognized and seen, and therefore is able to convey and be a vehicle message, but generally deterrence that is separate and different. He happens to utilize the same thing, same ability to be recognized within the Black community as a way of furthering Mr. Shalaya's own enforcement capabilities. There's no way we would allow that. Why is the fact that he's Georgian any less difficult? The government wants to defend this? Not beyond what I... Then why don't you move on? Thank you, sir. The conscious avoidance point relies on overwhelming evidence, and really the overlook much of the trial record with respect to Mr. Kurtz's actions. Just to put this in sort of crisp context, because there is some alighting of what actually happened in the record below. Mr. Kurtz participated in this scheme in multiple ways, and there are multiple indications that he actually knew what was going on. The defense here from the very opening statement was not that he didn't know that there was a conspiracy afoot, but that he didn't understand what the nature of or the object of the conspiracy was. At the very outset of the casino scheme here, which to be clear, the poker house is a poker house where you play cards. It's not a poker house where there are electronic slot machines being manipulated to deceive. At the very outset of the scheme to deceive casinos, Mr. Kurtz picks up an electronic slot machine on the side of the road from a confidential source who had been previously engaged with Shalia in selling stolen goods. He doesn't move it to the poker house. He moves it to the private home of a co-conspirator, where Mr. Melman, who is the software engineer, for lack of a better term, comes to begin the process of decoding and learning how to mirror that particular machine. Mr. Kurtz and the Shalia enterprise then move that machine to the illegal gambling establishment where actual poker with cards are played. Mr. Kurtz is on video walking Mr. Melman, the software engineer, up the stairs to go and manipulate and service the machine. I'm going to interrupt for just a second because I thought we were going to be talking about the conscious avoidance instruction and not knowledge, a sufficient challenge as to knowledge, and not whether there was harmless error if conscious avoidance instruction was given. Aren't those separate questions? Does government rely primarily on the silent drive to Atlantic City to justify the district court's decision to give a conscious avoidance instruction? Maybe you can straighten me out if I'm misunderstanding. Certainly, Your Honor. I think they overlap, but I think they overlap to a great degree. It is not the case, as the reply brief suggests, that the only fact that we relied on for the conscious avoidance instruction was the silent drive. In fact, if you turn to my statements to the district court to make the argument, and then the district court's ultimate ruling referring to both the silent drive and the other evidence that we put forward, we were talking about not only the silent drive, but the other evidence that I'll walk through that, Judge Carney, what I believe indicates are situations, circumstances that are so overwhelmingly suspicious that the failure to question those contrivance, in the words of this court, to avoid confirming actual knowledge. I think that the jury, from all of this evidence, has plenty to infer that he had actual knowledge of what was going on. But even assuming that they didn't, all of this is overwhelming evidence that he purposely contrived to avoid learning. So he walks in, he walks Mr. Melman into the poker house. He later drives to a New Jersey bathhouse to re-deliver the same electronic machine to the same confidential source. He then drives Mr. Melman to an Atlantic City casino, riding in silence, for the purpose of collecting data, for the purpose of decrypting and essentially mirroring the random number generators. Well, Ms. Bennett says they didn't even speak the same language. Maybe they had a little Russian in common, but I can imagine someone riding in the backseat and treating Mr. Cortese as their chauffeur and protector. Why is that really suspicious? The why there, certainly, there's nothing in the record to indicate why they didn't talk. I think it's perfectly well-founded and the inference can easily be things to a guy you don't know that well. But the fact is there is information in the record that shows they both speak Russian. And so there's no basis to think that they can't communicate. On that drive, they collect the data that I just described. And then two more critical pieces of information here. The first is the phone call that he has with Mr. Shalaya, where Shalaya expressly discusses how it is that another co-conspirator is essentially training and practicing to conduct the fraud. And Mr. Cortese does not say much on the call other than to agree and assent that he knows what Mr. Shalaya is talking about. And the jury is perfectly well equipped and entitled to infer that Mr. Cortese is hearing a discussion, the context of which he understood from prior discussions and prior information. And then finally, it's the content of the phone. And this is a point that is, I think, it's very clear in the trial record what we're talking about. It's, I think, set out in our brief. It is in the briefing from Mr. Cortese, it just does not map onto what's actually talked about at trial. There are a series of images. They are live images, that is very short, moving clips of video that are on Mr. Cortese's phone. They are incoming, so he receives them from another person. And they are marked as red, so he actually sees these things. What they are, what they show are not spins of the wheel, which are critical to developing this mirroring software. What they are instead are pay lines, or what Mr. Melman describes as pay lines. Those are another critical piece of information that you have to have in order to understand how to rig the slot machine, or how to rig the on this exhibit at trial. And it's exhibit 905G, and he describes exactly why it is that those things are relevant. So in the reply brief, though, your adversary comments that for the slot machine videos to hold any value for the wire fraud screen, the video had to include at least four rotations or screens of symbols, and that the four videos found on Mr. Cortese's phone were entirely different, two to three second .MOV videos connected to a photo PDF file, and not the longer videos that he received and used for the wire fraud scheme, that they were different and unrelated. Is that incorrect? That is incorrect. And there are two ways in which that's incorrect. The first way is that Mr. Melman didn't testify that you need a video of four rotations. What he testified to, this is at the appendix, I think at 937, is that they needed four screens. They need to see the screen. And it's true that you need to see how a game is playing and what the results are in order, basically in order to tell where within the life of the program on a given machine that machine is. And that's true. That's not the kind of photo that is shown on Mr. Cortese's phone. And what's on Mr. Cortese's phone is a different and also necessary piece of information. It's the pay lines that are shown on the photo. And essentially what he is receiving is photographs from a conspirator of other slot machines in a casino. There's no need to be showing rotations here. The only thing you need to know is what that pay line shows. The only thing Mr. Cortese needs to do with that information is show it to Mr. Melman or show it to Mr. Shillai or show it to whoever is developing the software. So your adversary also argues that there was no evidence that he did, in fact, show it to anybody. There's no evidence that he, well, it is true that there's no evidence that he walked in physically showed his phone to somebody. We don't have a witness who says that's what happened with that. And there's no evidence that he like forwarded, for example, the photos. These wouldn't need to be forwarded. They just need to be physically shown to somebody. Mr. Melman explains again how the pay lines are used. You would not need to see them move in order to benefit from them. And the inference that I think is plainly to be drawn here is that it's one thing if he had gone into a casino and taken photographs of a slot machine, not knowing why his friend Mr. Shillai told him to go take some pictures, but to be receiving otherwise completely uninteresting photographs of essentially the instructions for how to play an electronic slot machine has no, it makes no sense other than to assume that he is collecting that data exactly in the way that he and Mr. Melman drove to Atlantic City to go collect similar data and for the purpose of creating the kind of program to be used in the way that he and Mr. Shillai discuss on a phone call thereafter. And is that consistent with conscious avoidance? All of those are indications of circumstances that are so overwhelmingly suspicious. If you assume that he doesn't have actual knowledge of what's going on, all of that is indications of evidence that is so overwhelmingly suspicious as to indicate a purposeful contrivance not to confirm his knowledge as to why he's being sent to collect these things and what he's doing. Okay, Mr. Adams, we've kept you talking about Mr. Kortzenz's appeal throughout your time. Could you take another four minutes and speak about Mr. Shillai? Certainly, Your Honor. So let me start with the counsel point, if I may. And the court, I think, the questions indicate that the context, I think it seems fairly well understood here. It's correct that Mr. Cicutti was the CJA counsel and Ms. Louis-Jeanne was his co-counsel, also CJA. One point that I would just correct, to the extent that there's confusion about this, Mr. Shulman was not retained, at least insofar as the record reflects it. There is in the pro se reply brief, new evidence that was submitted. It's not part of the record below. I have no idea if it's authentic or not. But in any event, it doesn't show that he actually was retained by Mr. Shillai. What it shows is that somebody named Mr. Shulman may have received money from a woman named Tatiana Montana. That is the name of the person who pretended to be a paralegal in order to get into the MDC, which resulted in Mr. Shillai's It's also the case that Mr. Shillman was never denied the ability to come in before a trial. There's no indication that Mr. Shillman exists until after the trial is over. And if you look at the letter that purports to be from Mr. Shillman, that Mr. Shillai submits pro se months after trial, it doesn't say that Judge Forrest has denied my attempt to appear in this case. And indeed, he never did attempt to appear in the case. There's no notice of appearance for him. He never comes on the record. What it says is she will not let me, which is almost certainly not correct insofar as Judge Forrest did, in fact, allow Ms. Macedonio to be retained counsel while Mr. Security was standby counsel. Again, Judge Forrest may well have declined to move the but he didn't attempt to appear. And Judge Forrest never told him that he couldn't appear. That's just nowhere in the record. With respect to Mr. Nyman, obviously, Mr. Nyman drops out of the sky about 24 hours before sentencing. Judge Prescott does grant at least a brief adjournment to allow him to physically appear. He had said that he was unavailable as the result of a personal commitment before the sentencing. And he was allowed to speak. He was allowed to raise points largely about the tax loss relating to the contraband cigarette case or contraband cigarette fax, all of which was in detail set out already at trial so that the tax loss issue really was not something that could have required a FATICO in any event. That's Mr. Shalaya's counsel history. If there's specific questions on that, I'm happy to address it. And then finally, with respect to sentencing, Judge Carney, your question, I think, was spot on. Mr. Shalaya was not just a run-of-the-mill fraudster. He was not sort of a run-of-the-mill low-level member of an organized crime group. He was the vore in this case. That is somebody who is dedicated to essentially a life of criminal activity. And he lived that life to its fullest. He committed kidnappings in order to steal and extort the information to conduct an elaborate wire fraud scheme, the casino scheme, which in itself was sophisticated and prolific. And by the way, unlike what is also stated in some of the briefing, it was successful. They did, in fact, achieve the ability to mirror these machines. It was demonstrated for an undercover officer. He oversaw and, in fact, himself administered multiple violent reprisals of people that insulted him in any number of ways, from the petty to the financial. He pistol whipped his own nephew. He oversaw a melee, really a beatdown by 30 of his co-conspirators of about five rivals. He, with Mr. Kurt Sidza standing over, assaulted people who had essentially been rude to him at a restaurant. The list goes on and on. I think we do have the list and the PSR and so on in front of us. Thank you very much. We've kept you past your time. We'll hear rebuttal then. Ms. Bennett, you have one minute, please. Thank you, Judge Kearney. We just heard Mr. Adams say this, the wire fraud scheme was sophisticated. It was. And the question is not with respect to the conscious avoidance instruction, whether there was, and of course, there is a collapse when we're looking at the harmless error aspect of it, as Judge Kearney identified. But the question for purposes of giving the instruction is not whether there was sufficient evidence of Mr. Kurt Sidza's actual knowledge. It was whether the evidence in the record was such that it's such that a rational juror could reach the conclusion beyond a reasonable doubt that Kurt Sidza was aware of a high probability of this computer programming fraud. And the fact that he, the pictures that he received on his phone and that were opened, and that there was no testimony that he showed them to anybody, no matter what Mr. Adams says about how they could be used. There's no testimony that he used them in that way. And in fact, almost all of the trial testimony about the footage from these machines was with respect to the videos and the rotations, which is at page 863 of the appendix, the number of rotations that were necessary. At trial, and I take issue with Mr. Adams's characterization of the defense aligning certain facts. At trial, that Melman, the programmer, was at, testified that so far, you can only see on the, with respect to the videos, such as the type on Kurt Sidza's phone, the short ones, the lot, which are basically the live photo feature on an iPhone. So far, you can only see on the video that this is the right machine. And it is the price of the $1 machine, which is very rare. And judging by the paper, judging by the payline, it should be possible to open this machine. So it's not clear that these types of videos were, that these photos on Kurt Sidza's phone were ever even used by anybody, even if they were the type of photos, as opposed to the video, which was- But why would you send them, why would you send them to him? They may have been sent to multiple people. It may be. Yeah, maybe that might be true, but that doesn't answer my question. What would it be a reasonable inference to say that they sent them to him because he had a part to play in giving them to someone else or understanding them? Would that be a reason, just would it be a reasonable inference? It might be a reasonable inference. And then the question is, is that inference enough to hang a conscious avoidance instruction on? So even if you can infer that Kurt Sidza showed the photos to somebody else, is that proof beyond a reasonable doubt that he consciously avoided it? He raised, in fact, his lawyer at the very beginning of the trial said, my client didn't know anything about these poker machines, right? So that was me. So knowledge was- Well, I wasn't laying it on you because I didn't remember for certain whether or what, but I mean, knowledge was an element of the defense, lack of knowledge. Knowledge is always obviously an element of the conspiracy. And the reason that you have the second requirement, as Judge Wesley, as you know, from the Nekhtalov case on which you sat, that you need that second element because you can't just use, you can't just use proximity, for example, as a proxy for knowledge. You need to have the additional factor of the proof beyond a reasonable doubt that you could infer that he was not just, should have known, obviously negligently not knowing, even recklessly not knowing is insufficient. You need to have proof beyond a reasonable doubt upon which a rational juror could base a decision that he took affirmative steps, that he consciously, willfully blinded himself to the nature of the scene. So even if it is a reasonable inference that he, having received those photos, showed them to somebody else, the question is not whether that's a reasonable inference, but whether that reasonable inference is sufficient for a rational juror to find beyond a reasonable doubt that he willfully blinded himself to the nature of this artifice. I think we have the argument. Thank you, Ms. Bennett. Ms. Feldman, you have a minute of rebuttal. Thank you, Judge Carney. I just want to point out that the government's recitation of the counsel issue, I think in part supports Mr. Shulman's argument, because if we take out Mr. Shulman from the picture, as the government suggests we should, then really Mr. Nimitz's that he was seeking to retain him, not more. And although the court did indicate that Mr. Nimitz could come in in the afternoon because he had a funeral in the morning, which is part of the record, the government does not indicate that a one-month adjournment would have prejudiced them. The government does not indicate that it would have changed anything for the government if Mr. Shulman, facing the kind of sentence he was facing, could have had an attorney of his own choosing represent him more fully at sentencing. He did participate to the extent that he could, but certainly he had asked for something that was quite reasonable and not at all prejudicial to the government and should have been granted. Thank you very much. Thank you. Well argued all. We appreciate your argument. We'll take the matter under advisement. Thank you. Thank you.